21-42-31, United States v. Hunt I want to make sure that I have that how I know we have like six defendants but I think we have three arguing counsel and I just want to make sure I have this right. So what I have is that Ms. Quagliana, am I saying that right, is going first followed by Ms. Albrow followed by Ms. Tomah who's appearing remotely, is that correct? That's correct. Did I say your name correctly? Very close, it's Tomah, your honor. Okay and then Mr. Samuels is arguing for the government. Okay, glad to have confirmed that and I assume that counsel will tell us which defendant they are hearing on behalf of but with that in mind we'll hear from our first counsel who has five minutes I believe for the initial argument. Your honor, Rhonda Quagliana on behalf of Dashaun Richardson. Your honors, we attended a very lengthy trial in the district court in this case and there was there was a lot of evidence over many weeks and in fact over many months and what I am here to say on behalf of Mr. Richardson is that we have a legitimate claim, this is not deficiency of the evidence LITE, we have a legitimate claim that there is insufficient evidence in this case to convict Mr. Richardson of a RICO conspiracy. I would ask the court, please don't let the government take us on, take us down rabbit trails. We know what the elements are, we know what the standards are, what the government is going to ask the court to do is to review the relevant trial evidence in piecemeal fashion rather than in cumulative context and that's what the court has to do. The court has to look at the entire record to make a determination about whether there is sufficient evidence here such that a reasonable fact finder could accept that a reasonable fact finder could accept as adequate and sufficient to prove Mr. Richardson's guilt beyond a reasonable doubt. Here's what happened, okay, we started this trial and we went through weeks and weeks and weeks and weeks and weeks and weeks of testimony and the government laid out a compelling case that there was a RICO conspiracy involving the 36th Street Bang Squad. Fair. And at the beginning of this trial, up until the government started to present evidence about the double homicide on April 6th, Mr. Richardson was nowhere to be found. Nowhere. And then we had evidence on the April 6th double homicides and that was really the heart of the government's case against Mr. Richardson. But it turned out that the government could not meet its standard of proof at trial and this court should find that there is not substantial evidence that Mr. Richardson had any role in those murders or even knew about them, even knew about them. What the government presented was an all-or-nothing theory with respect to those events. Either Mr. Richardson stood around Marshall's Court on April 6th, took somebody's weapon, went out to this street corner and fired shots with three other people, or someone else did it. And in fact, if you look at the entire record, what you have is not only a lack of substantial evidence that Mr. Richardson was involved, but substantial evidence that somebody else did it. And that was the government's main witness against my client. And I think that's one of the reasons that the court should take a careful look at this case, because we're not just talking about, you know, a deficiency in the evidence. We're talking about evidence that actually established that somebody else did this stuff and it came from both ways. Counsel, can I ask you a question? Taking what you're saying as correct, that there's no evidence that Mr. Richardson committed this, but isn't there evidence that Mr. Richardson was involved in more racketeering activities? No, Your Honor, I would disagree that there's sufficient evidence of that either. But isn't that where your problem is, if there is a problem? No, I don't think so. I think that, again, you have to look at the government's case about what happened on April 6th, and they were mutually exclusive theories of liability. In other words, you know, either Mr. Richardson was there, he planned it, he went out, he fired the gun, and he did all the other things that the other witnesses claimed, or he did none of that. There isn't, there is a weird reading of the facts that he was, you know, there and planned and agreed and then everybody else went out and he stayed behind. There's, that's just a complete, you know, wrenching of the evidence that that wasn't the government's And then the only other evidence against Mr. Richardson really came in the form of some social media communications, where afterwards, the day after the murders, he told Martin Hunt, delete they status. And then there was a reference later to the shooting of Duane Dozier and some testimony that the government itself found so unreliable that they ended up dismissing the indictment, alleging that he was involved in a drug conspiracy and a related firearms charge. So that is what I would say about the sufficiency of the evidence. And the issue on sentencing relates because there is no, there was no, there was not a preponderance of the evidence under which the court could properly apply the cross-reference in this case. Am I? I have one question. And as long as we're asking questions, you're good to go. You just understood, understood. Um, do you dispute that there was also evidence that Mr. Richardson was selling drugs in the gang's territory? No, I don't agree with that. Well, somebody said that. How is that not evidence? Well, okay. Yeah, I'm sorry. Let me, let me try to distinguish. There, there was, there were testimony, there was testimony by one witness. Which the jury is then entitled to credit. The jury is entitled to credit it, but I think again, the court has to examine that testimony in the larger context of this case. Totally agree. Um, and I, I don't, I don't think the court should ignore the fact that the government ended up dismissing that indictment. Um, I know the court is not permitted to make, you know, credibility decisions. That's, that was the job of the jury. Um, but if you look at the entire record, nothing, nothing, none of the government's evidence put Mr. Richardson at the center of this conspiracy. Nothing put Mr. Richardson, you know, um, in the role of a planner, an organizer. There were other people who were doing that. Um, I think what we have here is really, really, really a case in which he was merely associated. And there was certainly a ton of evidence that showed him flashing gang signs and he was in pictures and, but that's, that's not enough to get us over that threshold. It really isn't. Thank you, Your Honor.  Got to have some time in rebuttal. We'll hear next from Ms. Albro. Good morning, Your Honors. I represent, uh, I'm Kimberly Albro and I'm here on behalf of the appellant Giovanni Douglas. I'm going to briefly address the issue of Mr. Douglas' pro se status at trial. And I think the core problem with, um, the denial of Mr. Douglas having counsel at trial is that the court, the district court did not properly analyze it. Uh, the district relied on a case from this court. Can I just ask a threshold before we even get to the question of whether he can get a lawyer back, there's the question about whether the district court correctly allowed him to assert his right to self-representation, the FREDA issue. Right. And I understand there's no dispute about the sufficiency of the FREDA colloquy that resulted in him being pro se in the first place. That was not in the briefing, Your Honor. Okay. Uh, so this, uh, United States versus Corcoran for, uh, Corcoran-Cuevas case, 35 FD 953, the standard is that you have to weigh, the court should have weighed the defendant's constitutional right to having appointed counsel against the government's interest in proceeding in an orderly and expeditious manner. But when Mr. Douglas asserted this motion 25 days after he was finally granted his pro se status, uh, all the court talked about was the prejudice to Mr. Harmon, that Mr. Harmon wouldn't be prepared that 25 days before Mr. Har- Mr. Harmon was Mr. Douglas's counsel until he was allowed to proceed pro se. Mr. Harmon had been told he only had to deal with procedural issues. So for 25 days, he had not been preparing for trial. And that's really all the district court said when it denied Mr. Douglas, his right to have counsel appointed for this lengthy RICO count trial. And so, uh- Counsel, do you contend that there's a sixth amendment right here? It's not an absolute right. But there's certainly a balancing test that was not applied for him to be able to revoke his pro se status. Well, but that's all within the discretion of the district court, right? It is a, it is under abusive discretion. Uh, but I, uh, we submit that Mr. Douglas, uh, the district court did abuse its discretion by only considering Mr. Harmon's position rather than, um, the government didn't assert that it was entirely, they had no position on Mr. Douglas's motion. And Mr. Douglas did give reasons in his motion for wanting to revoke his pro se status. And I had a very short amount of time. It has run out. So unless there are further questions, I will. Judge Motz, do you have any further questions? No, I don't. Thank you. You've got some time in rebuttal. Uh, and we will hear from our colleague on the phone or on zoom, I guess. Okay. Uh, you're having, excuse me. We're having an audio issue and we cannot hear the lawyer who's arguing. Good morning, your honors. And may it please the court, uh, Denny Taylor, Ryan Tebron. Um, there are some intervening opinions I'd like to address regarding the argument that Virginia attempted murder can be committed without the use, attempted use or threatened use of physical force. Uh, perhaps unsurprisingly, the landscape has been changing since the briefing, uh, given Taylor's proximity. Um, but I want to start with, um, the threshold question. So this court looks to Virginia law to answer this question. Um, the interv- the intervening decision in United States versus Thomas doesn't change that because Thomas is limited to its facts and it just doesn't apply to these circumstances. Um, and concluding that it could look to by car assault with a dangerous weapon instead of the underlying Virginia offense, the Thomas court reasoned that by pleading guilty, Thomas necessarily admitted each of the elements making up the predicate by car offense charged in the indictment. That's at 273. Um, these of course went to trial and so they admitted nothing. Um, and the jury in this case was instructed only on Virginia attempted murder, Virginia law. So distinguishing this case from Thomas, this court must look to Virginia law to answer this question. And it's notable that two other courts have followed this exact approach under these circumstances. The 11th, which the government actually cites Alvarado Linares, uh, and the second circuit also in Davis, both of those courts did that, um, and it should do so here too, uh, so looking at two Virginia law, Virginia attempted murder, not a 924C3A crime of violence. Um, and so we start with Taylor, which made clear that not all attempts to commit crimes of violence will qualify, not all of them. Um, in court's efforts to answer the obvious next question, which ones, uh, there's been a bit more nuance that's developed in the post Taylor landscape recently, and since the briefs were filed, um, the seventh circuit has upheld attempt crimes as crimes of violence, where the attempt is an attempt to commit every element of the substance of crime. And that's United States versus States, um, 72 F 4th, 778 at 788. Um, so I don't think this court has to really take a hard position on exactly what may or may not qualify because even under that standard, Virginia attempted murder, we don't believe would qualify even under that approach. And that's because as this court recognized in Simmons under Virginia law, an overt act only begins the commission of one of the elements of the crime, not all of them, and so we would argue that Virginia attempt is simply a different animal and under, I think that approach that's come out since it still wouldn't qualify. And I think that's enough to resolve this question on this angle of it, um, very narrowly and without the court having to take a broader position that perhaps they may wish to develop in future cases. Um, just like in Taylor, the Virginia overt or the substantial step required for Virginia attempted murder just need not be violent. And so this is the narrow- Counsel, are you, are you at all familiar with the case U.S. versus Lassiter, which we've not decided it was argued in October? I am. Can I ask a question of like, just as an order of operations, isn't Lassiter just going to answer this question? Because isn't the question in that case, whether Virginia attempted murder is vicar assault, is a vicar assault crime? The, the question is the same, your honor, uh, whether or not it will answer the question, I suppose may depend on which opinion comes out first. Um, but the difference between our argument and the argument that's made in Lassiter is that we've actually made more arguments. And so we share one aspect of our argument in common with Lassiter, but we also make broader arguments and other arguments like the omissions argument that Lassiter has not advanced to my knowledge. But I mean, if this court in Lassiter were to say, is, I mean, I guess the best version of your view is that Lassiter says it's not, and if Lassiter says it's not, your client just wins this issue. But if Lassiter says it is, your client just loses this issue, right? Um, he loses this, but we still of course have the omissions argument as well, which Lassiter won't resolve. Okay. So, um, and I guess, you know, I would just say before I move on from that, that it isn't true that no attempts would qualify as the government claims, because under the seventh circuit's approach, the attempts that can consist of attempts to commit every element would count, whereas of course ours would not because it's only one element. So I'd like to briefly address omissions with my remaining time. Um, so we believe that Rumley's speculation about the omission liability under the ACCA was dicta. That's, um, several second circuit judges have also said that outright. Um, and the Supreme court didn't consider malicious omissions. And so Castleman's holding could extend to, even if it could extend to omissions fairly, which it wasn't really before the court in that case, it doesn't extend to attempts and that's because there's, unlike the statute at issue in Castleman, which required bodily injury, um, and like murder statutes, et cetera, there is no bodily injury required with attempts. And so we would distinguish that very clearly. That's not a position we think this court should take or is justified even under Castleman. I see my time has expired and I'm happy to answer any other questions the court may have. Judge Motz, do you have any questions? I do not. Thank you. No, thank you. Okay. Thank you very much. Uh, we'll hear from the government. Thank you, your honors. Good morning. May it please the court. Brian Samuels for the United States. Your honors, as Ms. Quagliano, my colleague referenced, this case did involve an extended period of time at trial that covered some 10 specific acts of violence and other acts of drug dealing and other racketeering acts from time period of 2015 through 2017, the trial itself involving some seven defendants took approximately seven weeks to try. I know there are a number of issues here, your honors. I was going to address them in the order in which they were presented this morning, and certainly if the court has questions, happy to entertain those. The first issue that Ms. Quagliano raises is with the sufficiency of the evidence with respect to Mr. Palmer's drug sales and why those sales were connected to the enterprise. Yes, your honor. Those drug sales, which I believe were provided evidence by Mr. Atkins, who was Mr. Palmer's close friends, occurred in the territory of the 36th street bank squad area that occurred around the H and H market. It occurred around the area of Seven Oaks and Marshall courts. That was an area that was restricted for the activities of 36th street bank squad. Mr. Palmer engaged in sales of exotic marijuana during the time period of the conspiracy. That is the best evidence, your honor, of the drug sales of Mr. Palmer being connected to the racketeering enterprise because it occurred in gang territory during the time period that the gang was operating. How many drugs? I mean, I guess it's possible someone's just an idiot and is selling drugs in a place they're not supposed to. What is your best evidence that he wasn't just an idiot selling drugs in a place that would have been very dangerous to him be selling drugs? Well, I think our evidence of that, your honor, not only is the territory and the time period, but also Mr. Palmer's other involvement in the racketeering enterprise, his or acts that showed his involvement beyond just the drug dealing. And of course we need that other involvement. We have it in this case. We've got Mr. Palmer retrieving a firearm, his close friend Jarell Atkins. When Mr. Atkins is running from the police, drops a firearm, has a phone call with Mr. Palmer. Mr. Palmer indicates that he retrieved that firearm. We've also got Mr. Palmer involved in, tangentially involved in what we refer to as the sonic shooting when a group of gang members went out in a retaliatory act of violence and tried to Mr. Palmer was stopped by police in a car that evening with other members of the gang, including Martin Hunt, Shaquan Ford. And I believe there's one other member as well. And then some other significant evidence, your honor, is Mr. Palmer involvement in the Vicar attempt to assault with a dangerous weapon of Dwayne Dozier. And the chronology of that is significant, your honor. That was another piece of retaliatory violence where the gang was engaged in some back and forth retaliation that really began with the tragic murders of Domingo Davis and David Richardson on April 6th, 2015. After those murders, Jamari Green, a member of 36th Street Bang Squad's house was shot up. Mr. Green communicated with other members over Facebook about wanting to retaliate that night. Martin Hunt essentially said, no, it's too hot. We're not going to retaliate that night. There was other Facebook message traffic 10 days later on April 17th when the gang members were talking about seeing Dwayne Dozier. And this bleeds a little over into Mr. Richardson. There's a comment by Ryan Tabron where they talk about seeing Dwayne Dozier. Ryan Tabron says, pop him. And then an hour or two later, Deshaun Richardson responds, essentially, why didn't you pop Dwayne? And then there's a response right after that that tells us what the meaning of that question is. And the response was, he's at work at a gas station. There's other people near him. And then the evening of April 27th, about 10 days later, in a car driven by Shaquan Ford with Jarrell Atkins in the front seat and Corey Sweetenberg, Jamari Green and Raymond Palmer in the back, the three men got out of the car and made multiple shots into the house of Dwayne Dozier. His mother testified as a witness. There were various shots that hit the outside of the house and a vehicle outside of it. Both Corey Sweetenberg, Jamari Green, Shaquan Ford and Jarrell Atkins all testified to that incident and they testified to Mr. Palmer's involvement and that this was part of that retaliatory back and forth chain that I described that showed Mr. Palmer's involvement in the racketeering conspiracy, Your Honor. Well, counsel, is it fair to say there's no direct evidence that he agreed to the commission of two racketeering counts? What you have is a bunch of circumstantial evidence, which you say is sufficient for the jury to conclude that. Is that correct? I would say that certainly, Your Honor, with respect to the drugging activity, with respect to the shooting of Dwayne Dozier's residence, I do think the evidence of that is a little bit more direct because you've got other conspirators testifying as to the agreement to go and shoot Dwayne Dozier's house in retaliation for the shooting of Jamari Green's house. And so for that incident, Your Honor, I think it is a little more direct, but certainly I would I would suggest or submit that conspiracy can be proven by circumstantial evidence that shows even a tacit agreement among the conspirators. And we had Mr. Palmer as well in different gang photos associating with the members. There was other evidence that showed his involvement in the group outside of the activities of selling the drugs, outside of the activities of shooting Dwayne Dozier's residence. If there are no further questions on that point, I would return to Mr. Richardson. Again, Mr. Richardson would like to set aside his conviction and he in doing so in the government's position, he would like to dismiss or at least certain testimony and evidence that was presented. And certainly the government wants the court to look at the entire picture here. I think of the evidence, the exhibits, the witnesses as building a house that can be looked at with respect to the conviction. And certainly Miss Quagliano can come in here and say, well, that house, no reasonable juror could find that that's a house, no reasonable juror could conclude that what was built and what was presented there constitutes that crime. What she cannot do is take an inconsistent verdict and use that as a sledgehammer or wrecking ball and come in and try and take apart chunks of that house. And so do we have the house built on Mr. Richardson? I would submit, of course we do, Your Honors. And we get there in a number of ways. First of all, we do have evidence of Mr. Richardson, both direct participation in the murders of Domingo Davis and Jada Richardson and in the agreement to murder those two young people on April 6th. And what is that evidence? Of course, it is the testimony of Corey Sweetenberg, who not only described Mr. Richardson at that point, but he early testified in the trial that in 2014, Mr. Sweetenberg and Corey Sweetenberg were all at a school visiting with guns, again, showing their participation in the reparation together. We have Mr. Sweetenberg seeing Deshaun Richardson with Timothy Smith's gun together with Martin Hunt and Stephen Harris and Xavier Green on April 6th. Mr. Sweetenberg sees the men leaving that night to go and look for ops, this practice of op-shopping, where they're going to retaliate against other acts of violence. We've got Mr. Richardson admitting to Corey Sweetenberg, along with the other participants that they were involved in shooting Jada Richardson and Domingo Davis. But it doesn't just stop with Corey Sweetenberg. We've also got testimony from Raquel Jackson, who was the brother of Martin Hunt, Raquel Jackson, who testified that Stephen Harris, Martin Hunt, Xavier Green and Deshaun Richardson all came to his mother's home after the murder that night. He saw Deshaun Richardson acting district and he described Deshaun Richardson having a Glock. He knew Deshaun Richardson on site. He described him as Day. Other witnesses provided his nickname as Day Day. And then Raquel Jackson also admitted to dropping off Deshaun Richardson later at a bus station. Let me, let me ask you this. I, um, because in your brief, you cite three different, um, you cite what you, what you just discussed and then you talk about the Facebook. But this testimony of Mr. Pemberton, um, particularly the, the funnel of truth, um, yes, that the government, uh, states, I believe in a closing argument that, you know, that Mr., I guess, Mr. Pemberton fell. Um, and so, but now you present it as evidence of his participation in, in for purposes of the conspiracy. So I'm interested to see if the government pretty much denounces Mr. Um, Pemberton, um, during a closing argument. Certainly your honor, we did not ask the jury to rely on Mr. Pemberton's testimony in making a guilt determination on Mr. Richardson. Let me be clear. Mr. Pemberton was just testifying about drug sales and drug distribution that Mr. Richardson was doing with Mr. Tabron. So this is outside the murder evidence that I was discussing, but we did tell the jury, um, that they did not need to consider Mr. Pemberton, but it was evidence that was presented, uh, and going back again and looking at the jury's deliberations and kind of engaging in that post-talk process was exactly what the district court found. And it's very comprehensive rule 29 opinion that should not engage in that. So. Pretty authority on that specific thing. I, it struck me as weird and I thought about it. And so conceptually, I'm like, well, in deciding a sufficiency challenge, we look at all the evidence, I guess, including evidence that the government tells the jury to disregard, but that seems weird, but I couldn't find any cases dealing with like, I mean, other than the general principle of yeah. But do you have any cases dealing with this specific question when a party says, don't listen to that person. And then we decide whether we can consider that person in a sufficiency challenge. I don't your honor. And again, I would rely on the, the Powell and its legacy with respect to insufficient verdicts and the admonition that the court should not go in and try and engineer and look at what the jury is thinking. And then we also tell juries. They can credit some of what a witness says, none of what a witness says, all of what a witness says is the jury that makes credibility determinations. Um, it's not the government that makes it. It's not Ms. Court that makes it other than reviewing to see if any reasonable juror could have found that. I don't know that that piece was a particularly important part of showing Mr. Richardson involvement in the Rico conspiracy. Um, but it is a read. It is something that is there. It is something that the jury could have relied on. And I guess if we were inclined to think you didn't be well, I guess if we were inclined to think that's kind of a weird thing to do. So maybe best just not do you think the evidence is sufficient without that evidence? Oh, your honor. I certainly do. So you think the court could just say, we don't really need to decide whether what to do in that particular situation where the government disavows a witness, because even without that, the evidence is sufficient. That's correct, your honor. And that goes not only to Mr. Richardson, the evidence of his personal participation in the murders of Domingo Davis and Jada Richardson, I won't go through it all, but there are also various co-conspirator admissions. A big part of the gang was updating other gang members as to the acts of violence and the things that were done on behalf of the gang. And so Stephen Harris admitted to Jarell Atkins. He admitted Jamar Green. He described the involvement of himself, Mr. Hunt, Mr. Green and Mr. Richardson. We also had Mr. Hunt describing that same involvement to Mr. Ford, but he left himself out of it. So there were other co-conspirators that were talking about it. And then there was the forensic evidence, which is significant in this case, because we had these firearms linked to one another by NIBIN associations. And there was a revolver that was used in the murder of Dwayne Parker, a revolver that was also used a month later in the shootings of Davis and Richardson. And then the firearm that was attributed to Mr. Richardson, which was a firearm purchased by Tim Smith, where the gang would often hang out, was reported stolen April 18th, 2015, later found, and then determined to be one of the murder weapons used in that incident. So you've got his individual participation. You've also got Corey Sweetenberg describing that he was there with the group earlier in the day that they were agreeing to go out and look for the op shopping. You've got on the back end, Raquel Jackson describing that he was there with the Glock after the murders. You've got the Facebook evidence where he's telling his co-conspirator, delete your status, and that status was basically Mr. Hunt saying, when I see an op, I get to busting. And in the aftermath of that, he was advised to delete that. And then there's some back and forth on the Facebook about Mr. Richardson telling Mr. Hunt and Mr. Sweetenberg to call him that next day. So there is other evidence, other ways you get there. And then there's also this piece with, as I mentioned, Dwayne Dozier, where Mr. Richardson, part of that group chat, going back and forth and says, why didn't you pop Dwayne? So there is other evidence that the court can rely on. And I think what's important to note, too, is even if you would say that there's some merit to this inconsistent verdict piece, I would argue that the verdict isn't necessarily inconsistent. And that's because of the nature of RICO conspiracy focuses, not on an act, but on an agreement. And this is a Glacier conspiracy where we're looking at types of racketeering activities. And so all we have to show is that Mr. Richardson agreed that he or another member of the conspiracy would participate in two acts. And this other evidence, even beyond his personal participation, does establish that. I'd like, if I may, unless the court has other questions on that point, I'd briefly address the points with Mr. Douglas. And I would submit that the court did not abuse its discretion in prohibiting Mr. Douglas from rescinding his pro se status and having his standby counsel come back in. And I think the record really shows how very careful the district court was in this case, how many opportunities it gave Mr. Douglas in the course of hearings in July of 2015, in August of 2015, to make this decision and go through this inquiry. And then what is so significant is that when Mr. Douglas decided to go pro se and determined he could, the court issued a very comprehensive order. And this is it, Joint Appendix 645, where it not only validated and granted Mr. Douglas's decision, but set forth parameters for standby counsel. And so this was not a situation where it was ever envisioned that standby counsel would be able to jump in and assume responsibility for the trial. And the court set this out 25 days in advance as to what standby counsel would do. There's no right to standby counsel, but the court determined that Mr. Douglas should have standby counsel for two reasons. Number one, so it wouldn't delay the trial. This wasn't just affecting Mr. Douglas. This was affecting the six other defendants who'd be waiting some period of time to go to trial. And number two, so that Mr. Douglas's trial rights wouldn't necessarily be prejudiced. Mr. Douglas was or excuse me, Mr. Harmon, the standby counsel. Was directed to facilitate discovery, providing some assistance perhaps with filing motions. And then the last piece that Mr. Harmon was required to do was to provide some procedural guidance to Mr. Douglas. And so what had occurred here is this was issued 25 days before the trial. The trial began. We had three full days of jury selection. Mr. Douglas had said, I'm ready to go. There was no motion or no indication ever made that he wanted Mr. Harmon to step in. And then over the first weekend, Mr. Douglas submitted a letter to the court saying, I've searched my conscience. I think I need counsel to be involved. When the court inquired of Mr. Douglas, if he had anything else to say at the start of the next day's trial, Mr. Douglas said he did not. It was clear from the record that the court wrestled with this, but did not find it to be fair to impose the requirements of stepping in on this case to Mr. Harmon because of the prior orders that the court had entered. So this is one follow up on something Judge Motz asked, which is, is the government's view sort of once under Faretta, the defendant validly waives his right to counsel. The Sixth Amendment is just gone. There is no Sixth Amendment right to counsel anymore. I would say that it's not unqualified, Your Honor. I think is the language of the cases that use that have examined that issue. Under certain circumstances, a defendant may, and I think Judge Davis had told the defendant that, and I think he told him this in one of his orders, that if you want your counsel to come back in, you need to make a motion to do that. And that was done prior to trial. My last question, I think, is on the Lassiter issue. What is the government's view about whether Lassiter is just going to resolve this vicar issue? Yes, Your Honor, government submits Lassiter will control and will resolve this issue. I do think, Your Honor, that under Thomas, I don't necessarily agree with Ms. Tama, and I apologize if I'm getting that wrong, that Thomas necessarily means that the court has to go into the state predicate if the federal generic predicate survives. To me and Thomas, that that was the court's caution that if we can determine that the federal predicate is a crime of violence, there is no need to go into these. I think this court describes it as a daisy chain predicates. So you have Thomas on that front and then you've got the pending decision of Lassiter, which in the government's view should certainly answer the question as to whether Virginia attempted murder is a crime of violence. I also respectfully disagree with counsel's view of the Rumley case. It did seem to the government that the decision and discussion about whether an omission could interfere with it being a crime of violence was squarely considered and decided in the Rumley case that that did not prevent it from being a crime of violence. A number of courts have also considered this issue. Again, the government's position on that would be an attempted use of force does have to mean something under that definition of the statute. And so when you've got a crime of violence that requires a completed use of force, as either of these predicates do in this case, either the murder or the assault with a dangerous weapon, an attempted use of force and attempted commission of those crimes also necessarily satisfies the definition of a crime of violence. I see I'm getting to the end and there are a number of issues in this case. I'm happy to address any of the court's questions. Judge Motz, do you have any questions? I don't. Thank you. Thank you. I have a lot of questions, but I'm not sure you can answer them all. All right, Liana, you have some rebuttal time. Carrying the metaphor over, the government had a blueprint for the house, they had the boards and everything else together to build the house of Deshaun Richardson. That's what happened in this case. And I appreciate being likened to a wrecking ball, but it wasn't me that wrecked the government's house. What wrecked the government's house was their own witness, Corey Sweetenberg. And what happened is, again, as the court considers the sufficiency of the wealth of evidence that was developed in this case about who actually committed these murders, who planned them and who actually went out and did the shooting. And the evidence was substantial that someone else did it and that someone else was Corey Sweetenberg. There were people who testified, the government's own witness testified that he saw Corey Sweetenberg at the scene, not my client, Deshaun Sweetenberg in contact with this weapon, put him at Tim Smith's residence and a whole host of other evidence that established that it was Mr. Richardson, it was Mr. Sweetenberg who actually did this. And so I don't think the court can simply ignore that and its analysis of whether there's substantial evidence here. The idea that Mr. Richardson may have agreed to the homicides, you know, at Marshall's Court, stood around, let's go op shopping, but didn't go out. He remained behind. That is a complete fiction. It's completely inconsistent with the government's evidence. There was no evidence, no evidence in this case at all that would make sense of that, including the forensic evidence that the government pointed to. The forensic evidence established that there were four weapons and they tied the bullets to each of those weapons, establishing that there were four shooters. And so Mr. Richardson was either one of the shooters or he wasn't one of the shooters. It was a mutually exclusive theory of liability. We're talking about knowledge of, though. So he didn't have to be one of the shooters, right? Not have to be one of the shooters, but there was not even evidence sufficient to establish that he had knowledge. Well, what about his Facebook entry in which he asked why others didn't pop Dwayne? Well, the sequence is important. The day after the April shooting, he posts to Martin Hunt, Delete De Status Pro. And the government makes will and the jury made what it will of that statement. The Dozier comment came later in April. I think it was April 11th or 17th. Thank you. It was April 17th. It was before the shooting of Dozier, wasn't it? Yes, ma'am. It was before the shooting of Dozier. Yes. But again, that is an isolated communication. If it's taken, again, in the context of all the other evidence in this case, the evidence is insufficient to prove that Mr. Richardson knowingly and intentionally agreed to conduct or participate in a racketeering conspiracy. And then he knowingly and willfully agreed that he or some other members would commit at least two racketeering acts. The evidence just isn't here, unless you believe that he committed these murders. And there isn't substantial evidence of that. Quickly, you know, to just put the plainest spin on it, it's not a spin, it's just what I can articulate, he shouldn't have been punished for committing these murders. That was completely erroneous by the district court. And I would ask the court to rename the case for sentencing on those grounds as well. The court erroneously found that the charged racketeering act associated with the double homicide were reasonably foreseeable and within the scope of a RICO enterprise. And therefore, Mr. Richardson should be sentenced under the cross-reference. I was going to ask you, so, and I understand the argument in the cross-reference, but you would agree that the court is looking at it from a preponderance of the evidence, and I believe the government says all of the evidence, is that correct? Yes, and that is the correct standard. But again, there wasn't evidence even by a preponderance here that Mr. Richardson was involved in racketeering, was involved in racketeering acts associated with, that were reasonable, foreseeable, and within the scope of a RICO enterprise. But there wasn't evidence even by a preponderance. And what the judge does, he basically makes the same error I think the government makes in understanding that under the cross-reference, Pagerton liability determines the sentence. And that's not true. And the other thing, so what the court ended up doing is finding that, or hinging its sentencing decision on an erroneous finding that Mr. Sweetenberg's testimony provided evidence by a preponderance that Mr. Richardson was present at Marshall's court and conspired with fellow gang members before the shooting and knew they would go out that night armed with a gun for the purpose of a gang-motivated murder. Again, if you view the record in its entirety, the evidence did not establish with reliable information, the existence of that fact, such that it was more probable than its non-existence. And so again, I would argue that, oh, I'm so sorry. You're good. As long as you're answering questions, you're good. I'm well-trained. I see red and I, you know, I apologize, but anyway, that, that, that would be the argument, your honors. Thank you. Judge Motz, do you have any further questions? I do not. Thank you. Ms. Albrow, you have some time. Thank you, your honor. I would say it is very difficult to find cases like Mr. Douglas's, where he obtained his pro se status and then wanted to revoke his status, but a fairly recent case, 2018 from this court Cohen, which is 888-F3-D667 and it's cited in the government's brief, did give some guidelines. The court, this court considered whether the defendant showed good reason for needing counsel at this time, which Mr. Douglas said in his motion that he had thought about everything the court had said when it granted his pro se status and he realized it was a bad decision. So all of the reasons that it was a complicated case that he needed the support of counsel, he realized once he went through the jury selection process. He did file his motion before opening arguments. But again, when the district court reviewed this, they did not look at the timeliness issue. They didn't look for the speedy and timely administration of justice, which are two other factors from Cohen, but most importantly, it's not in the record that anyone ever asked Mr. Harmon, if he was prepared to go forward. And he had represented Mr. Douglas for 10 months. He had done extensive discovery review, excuse me, review, and it's all in the record and I'm already out of time. So if there aren't any questions, I will sit down. Thank you. Jemma, you have some argument. Roboto as well. Yeah, I'd like to very quickly amend my earlier answer. There are actually two differences between Lassiter in this case. And we both raised a general Taylor argument, but to my knowledge, unless it happened at oral argument, Lassiter did not raise the distinction between Bourbigny's one element substantial step and the Seventh Circuit's all and of course the omissions argument. I just wanted to correct that with my apologies. With the remainder of my time, I'd like to elaborate on omissions. So we don't think Rumley's omission conclusions were necessary to resolve that case at all. But even for the sake of argument, assuming that they were, they don't control as to attempts. And here's why. Castleman stands for the proposition that where there's bodily injury, it must have resulted from some force. So it's fair enough, whether it's never applied that to omissions, but it was held that about a Tennessee domestic violence statute that required bodily injury for a conviction. So there was absolutely bodily injury. Rumley also concerned unlawful wounding. So wounding, there's obviously an injury. Virginia attempted murder. In contrast, it doesn't require bodily injury. And in many cases, including this one, there often isn't any injury at all. So it's one thing to say that where there's injury, there must be force. But it's a very different thing to say that where there's no injury at all, there must still somehow be force. That's a very strange conclusion. The Supreme Court has certainly never said that, and neither should this court. And it should join, at least to the limited extent of attempts, the well-reasoned opinion of the Third Circuit in Mayo and its progeny. And if the court has any other questions, I'm very happy to answer those. Seeing none. Thank you very much for your arguments. I want to thank all the lawyers for their help in this very, obviously complicated and important case. Ms. Quigley-Anna, I see you're court-appointed. Is that correct? I'd like to particularly thank you for your work in this case. The court relies on lawyers being willing to step forward and take on these cases. We appreciate it. And we very much value your work in this case. Pardon me. Well, much better than I was. You did a great job. Well, we'd like to thank them as well. The court relies on this in order to do our job, and we much appreciate the help.
judges: Toby J. Heytens, DeAndrea Gist Benjamin, Diana Gribbon Motz